**WIER et al. v. TEXAS CO.**

**LUDEAU v. TEXAS CO.**

**VIDRINE et al. v. TEXAS CO.**
Nos. 12806–12808.

United States Court of Appeals
Fifth Circuit.
March 2, 1950.

Rehearing Denied May 5, 1950.

George M. Wallace, Baton Rouge, La., Malcolm E. Lafargue, Shreveport, La., Atlee P. Steckler, Ville Platte, La., Joseph A. Loret, Baton Rouge, La., E. Herman Guillory, Ville Platte, La., Kalford K. Miazza, New Orleans, La., for appellants.

W. C. Perrault, Opelousas, La., L. K. Benson, New Orleans, La., Wiley G. Lastrapes, New Orleans, La., Marion U. Epley, Jr., New Orleans, La., R. C. Milling, New Orleans, La., for appellees.

Before HUTCHESON, Chief Judge and McCORD and RUSSELL, Circuit Judges.

McCORD, Circuit Judge.

The three suits we have here for consideration were removed from the state court of Evangeline Parish, Louisiana, because of diversity of citizenship and the requisite amounts in controversy. The plaintiffs in each case seek to recover from The Texas Company, a Delaware corporation, the mineral rights in certain lands to which they have acquired title through E. B. Norman & Company, predecessor in title to the Texas Company. The suits, being alike, were consolidated in the briefs, argument and disposition, without objection by the parties.

The complaints charge that the Texas Company is in possession of the lands, claiming ownership of the mineral rights under certain mineral reservations, and that such reservations are null and void for the reason (1) that at the time of execution of a certain deed of May 13, 1924, and a certain renewal agreement of February 11, 1929, purporting to reserve the minerals under said land to the Texas Company, the mineral rights in said land were owned by Lewis C. Black, a prior ancestor in title, and were not subject to reservation by the Texas Company; (2) that the reservation in the deed and extension agreement were void as an illegal reservation of the subsoil and an attempt to create two corporeal estates in the land,

which is invalid under Louisiana law; and (3) that the extension agreement was void for want of a valid legal consideration. Plaintiffs further sought to recover for the value of the oil and gas produced from the lands, rental for the use of the lands, and for damages resulting from drilling operations thereon.

The trial court, on motion of the defendant, required plaintiffs to produce their deeds to the land in controversy, and after issue was joined defendant moved for summary judgments of dismissal as a matter of law, under Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A. In support of this motion the Texas Company filed five affidavits, supported by exhibits, which disclosed a complete history of all material facts. The plaintiffs filed one affidavit in opposition to the motion. Defendant interposed objections to this affidavit.

The court withheld ruling on the motion to dismiss until it had permitted a full hearing and argument of the cases. Thereupon summary judgments of dismissal were entered, and the court rendered an opinion in which it separately found the undisputed facts and stated its conclusions of law thereon. Motions for rehearing were thereafter overruled.

A clear and exhaustive opinion by the trial court makes it unnecessary for us to set out the facts of the cases at length. See Wier, et al., v. Texas Company, D.C., 79 F.Supp. 299 et seq. However, the material facts are without dispute, and may be briefly summarized:

The Texas Company owned 14,599.04 acres of land located in Evangeline Parish, Louisiana, and on March 29, 1924, entered into a written contract whereby the lands were to be sold to E. B. Norman & Company, Inc., a lumber concern. Under this contract, the Texas Company was to reserve the minerals, and it stipulated: "It is expressly agreed and understood that the conveyance of the land and timber herein referred to shall be only the surface of the land with the timber, said surface to extend to a depth of five hundred feet to a line drawn horizontally with the surface, and The Texas Company hereby reserves and excepts all of the subsoil be-

low said depth and the gas, oil and other minerals therein contained, and with the right of ingress and egress on the surface to carry on operations for the development of said minerals."

The contract sale price for the lands was $438,000, $100,000 of which was to be paid in cash and the balance in four annual installments secured by a vendor's lien and mortgage. Under the agreement the purchaser, E. B. Norman & Co., was to cut the timber on the lands and sell the lumber to the Texas Company for $22 per thousand feet, and the price of the lumber delivered would be withheld and applied against the purchase price of the land and timber.

On May 13, 1924, the Texas Company executed and delivered to E. B. Norman & Company, Inc., in accordance with the contract, a recorded deed conveying the lands here in controversy "as one unit and one entity". Just following the descriptive part of this deed, this mineral reservation in favor of the Texas Company appears:

"It is expressly understood and agreed that all of the subsoil, or subjacent lands of said tracts of land, together with all of the oil, gas and other minerals therein, underlying and below a line or plane drawn horizontally at a depth of five hundred (500) feet from the surface of said tracts of land, is hereby excepted and reserved by said The Texas Company from and apart from the lands conveyed; that said The Texas Company also reserves and retains, and the said E. B. Norman & Company grants to the said The Texas Company, the right of ingress and egress on, across and through the surface of the said tracts of land conveyed, being in depth five hundred (500) feet from the surface of said tracts of land to a horizontal line or plane drawn through said tracts of land; and also the right of reasonable occupation and possession of the same for the drilling of wells, erection of structures, laying of pipe line, or lines, storage tanks, reservoirs

and other works thereon necessary and incidental for carrying on operations for the development and production of said minerals, or of any of them in and from said subsoil, or subjacent lands reserved and excepted from the tracts of land hereinabove sold.

"It is further expressly and mutually understood and agreed by the parties hereto that were it not for this reservation and exception of the subsoil from the lands herein granted and sold, and of all of the minerals aforesaid therein contained this sale and conveyance would not have been made."

E. B. Norman & Company entered upon the lands and undertook to carry out its contract with the Texas Company. It cut timber and manufactured lumber which it delivered to the Texas Company as part payment on its indebtedness under the mortgage. However, sometime in January, 1929, while it was still indebted to the Texas Company, it found itself in financial difficulties, and its president found it necessary to call upon the Texas Company for help in the discharge of its obligations under the contract and deed. A conference between the parties resulted in the execution of two further agreements in which the Texas Company made certain revisions of its original agreement so as to allow cash advances for the lumber delivered by E. B. Norman & Co., and made other concessions not here material. In return for these concessions, E. B. Norman & Co. extended and acknowledged for the second time the mineral reservations by the Texas Company in the lands in controversy in this wise.[1]

"* * * the said E. B. Norman and Company hereby takes notice of the fact that in said deed of date May 13, 1924, * * * that The Texas Company reserved to itself under the conditions and terms stated in said deed all of the minerals, oil and gas in and underlying said described tract of land * * * and does by these presents * * * acknowledge the own-

[1.] It is only pertinent to decision here to set out portions of one of these agreements since, as to the retention of the minerals in the lands, they are substantially the same.

ership of said minerals, oil and gas that may be in and under said described lands as being fully vested in said The Texas Company at this date · * * * that this acknowledgment is made for the purpose of granting anew said mineral rights to said The Texas Company and to act as an interruption of any prescription that may have accrued or may be accruing against said The Texas Company or against its right to go upon said land and develop the same for said minerals, oil and gas, and to perpetuate and continue said rights and privileges * * *"

E. B. Norman & Company continued to occupy the lands and to make partial payments to the Texas Company on its obligations until January, 1931, at which time its Louisiana properties were taken over by B. E. Halpin, as receiver, appointed by the Evangeline Parish district court. The receivership was brought about by the receiver of the National Bank of Kentucky. Halpin, as receiver, undertook to carry out the contract, and in January, 1932, he entered into a further agreement with the Texas Company whereby E. B. Norman & Company's indebtedness to the Texas Company was finally liquidated in September, 1932. After about two more years, Halpin found that he could no longer successfully operate the business, and he was granted permission to sell all of the E. B. Norman & Company assets, including the 14,599.04 acre tract of lands here in controversy. After an inventory and appraisement, a commission was issued to sell the property, and it was bought at public auction by the receiver of the National Bank of Kentucky. The commission to sell, the advertisements, and the deed of confirmation to the receiver all described the lands in controversy as sold "subject to the oil and mineral rights of The Texas Company, or its successors, in said lands". In 1941, after oil and gas had been discovered by the Texas Company on these lands, the receiver of the National Bank of Kentucky sold the lands to various individuals, many of whom are plaintiffs in these suits. The deeds recited that the sales were made "with the under-

standing that his right, title and interest to the minerals have not been proven".

██ We need not speculate as to the intention of the Texas Company to retain the mineral rights in these · lands, since these plaintiffs and everyone interested had written notice of such intention from the language of every instrument affecting the property. It is the cardinal rule, however, that in the interpretation of contracts we should ascertain the intention of the parties and give effect to that intention if it can be done consistently with legal principles. Snelling v. Adair et al., 196 La. 624, 199 So. 782; Arab Corporation v. Bruce, 5 Cir., 142 F.2d 604.

██ These being petitory actions, if plaintiffs are to recover it must be on the strength of their own titles. Simmons, et' al., v. Carter, 186 La. 377, 172 So. 425; Cupples et al., v. Harris, 202 La. 336, 11 So.2d 609; Smyth v. New Orleans Canal & Banking Company, 5 Cir., 93 F. 899. Here, the deeds comprising plaintiffs' chain of title show clearly on their face that plaintiffs did not acquire or purchase any interest in the mineral rights of these lands. The terms and conditions of the judicial sale from the receiver of E. B. Norman & Company to the receiver of the National Bank of Kentucky, through whom plaintiffs acquire their titles conclusively reveal that neither party believed any mineral rights were involved in the transfer. Moreover, the receiver of the Kentucky bank, having accepted and signed the deed with the mineral reservation in favor of the Texas Company, is now estopped not only from disputing the deed itself, but every fact which the deed recites. Gaines v. Crichton, 187 La. 345, 174 So. 666; Watson v. Succession of Barber, 105 La. 456, 29 So. 949; Reliance Homestead Ass'n v. Brink, 173 La. 331, 137 So. 52. And plaintiffs, being privies to this deed, are also estopped to deny the verity of its recitals as to the reservation. Gipson, et al. v. Gipson et al., 193 La. 807, 192 So. 355; Sandifer et ux. v. Sandifer's Heirs, La.App., 195 So. 188; Vol. 33 Words and Phrases, Perm.Ed., page 799. It becomes manifest, therefore, that since

plaintiffs' predecessor in title acquired no mineral interest in these lands, he could not have conveyed any such interest to the plaintiffs here. Cf. West v. Negrotto, 48 La.Ann. 922, 19 So. 819; Doucet et al. v. Fenelon, 120 La. 18, 44 So. 908; Clarkson v. Vincent, 32 La.Ann. 613; Wisner et al. v. City of New Orleans, 169 La. 1127, 126 So. 681.

There is no merit in plaintiffs' contention that a grant or reservation of minerals, as a separate mineral estate, is a nullity. The true rule in Louisiana is that the so-called mineral estate, regardless of how it is described, acquired or reserved, creates a mineral servitude upon the land. Frost-Johnson Lumber Co. v. Salling's Heirs et al., 150 La. 756, 91 So. 207; Wemple v. Nabors Oil & Gas Co. et al., 154 La. 483, 97 So. 666; Vincent et al. v. Bullock et al., 192 La. 1, 187 So. 35; Keebler et al v. Seubert et al., 167 La. 901, 120 So. 591. The further contention that a reservation of the subsoil below a certain level, together with the oil, gas and other minerals contained therein, does not create a valid mineral servitude is also without merit. Goldsmith v. McCoy, 190 La. 320, 182 So. 519; Iberville Land Co. v. Texas Co., 14 La.App., 221, 128 So. 304; Clement v. Dunn, 168 La. 394, 122 So. 122; Coyle et al. v. North American Oil Consolidated et al., 201 La. 99, 9 So.2d 473.

We conclude that the district court properly entered summary judgments of dismissal as a matter of law, for the reason that the undisputed facts, as disclosed by the pleadings, affidavits, and exhibits, reveal conclusively that there was no genuine issue of fact to be tried. Rule 56, Federal Rules of Civil Procedure; Wilkinson v. Powell et al., 5 Cir., 149 F.2d 335; Creel et al. v. Lone Star Defense Corp., 5 Cir., 171 F.2d 964; Board of Public Instruction v. Meredith et al., 5 Cir., 119 F.2d 712.

It follows that these plaintiffs have no right, title, or interest in the minerals of the lands described in their complaints, and they are not entitled to recover any damages or rentals for the use of the lands.

The Texas Company, being the absolute owner of the mineral servitude under the reservation and extension agreement, had the right to go upon the lands and explore for oil and gas, in addition to the other rights and privileges which it reserved under its contract with E. B. Norman & Company.

We consider it unnecessary to consider or pass upon the other issues raised by appellant, since they appear either to have been abandoned, or we find them wholly without substance or merit.

The judgments are

Affirmed.